So the next case on the docket is Solloway v. White, No. 17-13395. Once everyone has switched places, we have Mr. Kaufman for the appellant, Mr. Powell for the appellee. Mr. Kaufman, once you get settled, you can proceed at your leisure. Good morning, and may it please the Court. My name is Andrew Kaufman. I represent the appellant, Carole Solloway, in this case. The central question presented by this appeal as to the discrimination claims are whether the disputed facts demonstrate that Carole Solloway's requested accommodation constituted an undue hardship on the SEC. The answer to that question was used by the District Court to resolve two elements or two aspects of the discrimination claims below. First was to determine whether or not Ms. Solloway was a qualified person under the Rehabilitation Act. And in order to be a qualified person, she has to demonstrate the requisite skill, experience, and education, which is not in dispute in this case. She's worked for the SEC for many years and has consistently achieved successful ratings on all of her evaluations. The second question is whether or not she's able to perform the essential functions of her position with or without a reasonable accommodation. And this is where the District Court found that because of the nature of the accommodation she requested, that she was not a qualified person under the Rehabilitation Act. And in order to reach that decision, the District Court had to resolve several fact issues that apply to both of these issues. The first one is the Court ignored evidence that at the same time the SEC was making these determinations, it was operating a pilot program that allowed employees to work five days a week, telework from home. Isn't it, though, a little bit different to operate a pilot program, which is like a let's try this on for size and see if it works? In essence, to see if this is an essential function of the job or not, and a determination that in fact, this is an essential function of the job. I mean, the pilot program, I get it, and in fact, as I was working my way through the case, I sort of thought, isn't there some inconsistency between a determination that some physical presence is an essential function while you're running this pilot program? But if the pilot program is really just a beta to see if this might work, is there really any true inconsistency between those two things? I think there is in this case, because when the pilot program was in operation, there was no, there were no critical issues raised. The union didn't raise any objections to the pilot program. And so as it turned out, of course, in hindsight, they determined there were no, you know, harmful impacts on the workplace. In fact, they obviously ultimately dictated that they would expand the telework program to include five days a week. But it's more than just that, Your Honor. There is, at the same time this was going on, we knew there were other employees who worked five days a week teleworking. One employee named Gannon Lezane in the record is someone who had a back injury, and for at least 12 weeks, he worked five days a week teleworking without coming into the office. It's also, I think, a fact question to whether or not Ms. Soloway was meeting those obligations. There's no evidence in the record that she failed to come into the office to the extent that it affected her ability to do her job. Now, there were missed meetings, I think, that were highlighted for her, but at the end of the day, she received an acceptable rating on all of her evaluations. So there was no evidence that it impacted her ability to perform her job. Also, I would point to the time period during which there was a temporary accommodation in place for her back in 2011 or 2012. And it's not because once a temporary accommodation is made that the government is stuck with it. The employer is not stuck with that. But what it shows is that during that time period when the temporary accommodation was in place, and that was only five days of telework every two weeks, basically, it worked. All the evidence in the record shows that she performed her job from her therapist and from her own testimony, that that was successful. She was able to function in the workplace, do her job, and not be impacted by her PTSD. So again, that just goes to the fact question of whether or not it was an undue hardship, whether or not it was not possible for the SEC to accommodate Ms. Soloway in this way. Can I ask you a quick question, too? So as you said earlier, ultimately, the SEC, Mary Jo White, institutes this new policy on a going forward basis that you can telework five days, right? I guess, A, was there a connection between the findings of the pilot program and that determination that we can live with five day teleworkers? There's a very brief reference in the record to this. It was attached to the SEC's announcement of the new program where it indicates what I said before, which is that there were no criticisms raised by the, and there were no objections by the union. And sort of that just explained why the telework program was going to be brought for the agency as a whole. And the second question I have is this. There was reference, but vague reference, so far as I could tell in both of the briefs, that technology had advanced in such a way that would allow five day teleworkers. What precisely are we talking about? What sorts of technological advancements? What changed? Well, I'd say that teleconferencing or something. I think the argument by the SEC was that, I guess, improved bandwidth for the Wi-Fi or, you know, that kind of like the speed of the Internet, the improvement in equipment that would allow the transmission of information more easily from her home to the office. But I think it's important to note the district court didn't really rely on those items because there wasn't sufficient evidence in the record to show that those were, in fact, preventing her from doing her job. They were mentioned, but they were never really fleshed out as would be required under the hardship sort of analysis. I also want to, at this point, you know, this is also important as it relates to what she actually requested as the accommodation in this case. You know, her burden is to come forward with a request for an accommodation. At that point, there's an interactive process begins between the employer and the employee. And here, you know, she asked for the kitchen sink. That's undisputed. But she was encouraged to be creative and to come up with everything she could. And she did that. But the moment she made that request, she was locked into it. And the SEC never looked at any lesser options for her. They held her to that standard and ultimately determined that it would be a hardship because she was asking for so much, including, you know, never interacting with the employee who triggered her PTSD in the workplace. And so, and that was also true for the district court, which ultimately found she was unqualified and that it was a hardship because she demanded to be 100 percent free from any interactions from this particular employee. It's not only that she demanded to be free of that interference. It was also that she demanded to be free of the fear of any of that. Exhibit nine from her deposition. I'm open to other suggestions as long as it allows me the ability to totally avoid whoever this person is and my fears. And then there's something comparable to that in the interrogatory answer. Unless and until my psychological condition improves, I don't think I can work in the same building with Mr. So-and-so. I have to know and believe that there is no chance our paths can cross. He would have to be forbidden to come to my office and I would never have to go on the floor where he worked. Nonetheless, I could still work remotely or virtually as I do with remote audits and attend meetings. But the point is, it's almost to me, it sounds like she is requiring her employer to be the guarantor, not only of her physical state, but also of her mental state in terms of what her fears are. And how can they have that kind of control over another employee? And isn't that what she really is asking here? I mean, you talk about how flexible she is, but she's not flexible on that point at all. Well, I mean, the evidence is in conflict on this. In her deposition, she testified that she would have considered other measures that could have accomplished her goals. And we'll never know. I think just briefly to Judge Royal's point, her goal, the fixed point here is totally avoiding contact with this individual such that she would never have to face these fears. Right. So she's flexible, as Judge Royal says, to that point, but inflexible with respect to that. I think that's true. I mean, I think that there's no dispute. That's what she said in her request for accommodations. But look at the look at what happened. She avoided him for two full years during a period of time in which there were no accommodations in place other than her ability to take an ad hoc telework day from time to time and her use of her personal leave time. She had two days she got to telework, so she only had to cover Wednesday. Then let her telework Monday, Tuesday. He teleworked Thursday, Friday. So she only had to deal with Wednesday, right? That is correct. During that two year period of time, it was only the Wednesdays. And really, once they moved him to another floor and everything, her fear was about seeing him in the parking lot. That's true. That's really where the fear was, because once they didn't have him there on Thursday, Friday, she wasn't there on Monday, Tuesday. It all came to Wednesday and it was down now because he's in another building to the parking lot. And then what she did is used her leave to cover Wednesday. Yeah, that's essentially that is correct. She adjusted. And that's what actually happened. But what's missing here is the employer never came back and said, you know what, we can't give you what you want, but we can give you something less. We can give you four days every two weeks instead of five days every two weeks. We can give we can allow you to use your PTO time intermittently or we can give you an ad hoc day every every couple of weeks. They never came up with something that was smaller than what she'd initially asked for. And because of that, they were locked into a position where it was a hardship. I want to make sure I understand the fear here. She had the bad experience with the rape 20 years before, and then she learned through office conversation. This gentleman had been convicted, unrelated totally to all that, recently of looking at child porn on the office computer. I think to be totally fair, it was not necessarily child pornography. He was accused and investigated for reviewing pornography on his work computer. OK, well, I'll take away the child pornography. He was pornography on his work computer. Correct. That was all that was isolated from her experience. I know it triggered and she had genuine PTSD. But I'm just trying to make sure I understand what he was convicted of. Yeah, that was that was essentially it. It hurt. There were some images. Was it a misdemeanor or a felony? Well, it wasn't. It wasn't a conviction of the criminal. OK, so it was a disciplinary action and they didn't fire him. They suspended him, though. Yeah, he was subject to some form of discipline because he violated. And was there any evidence he ever did it again? No. Thank you very much. Morning, may it please the court. I'm David Powell, an assistant U.S. attorney in the Northern District of Georgia, and I'm here representing Commissioner of the Securities and Exchange Commission or SEC. The. As far as the whether Ms. Soloway was qualified, of course, she has the burden of establishing that every required element of her position that she could perform under the accommodation she's proposing. It's also her burden administratively to come forward with a reasonable accommodation. And here, the only accommodation she wanted in 2011 was had to do with having full time telework and to never come into the office. That was those were her parameters. And the SEC granted her a temporary solution that it thought reasonable. And it continued until December 12th of 2011. Ms. Soloway, in hindsight, says that that worked and the SEC believes it worked. But Ms. Soloway never conveyed that when her request for five day a week telework was denied, never came back and said, but what I've been doing is adequate. And the SEC going forward essentially allowed her to continue under almost the same program. It continued to have the ARO employee on Monday, Tuesday telework, Ms. Soloway on Thursday, Friday telework. And Ms. Soloway still had the availability of using ad hoc days on Wednesdays. And in fact, exhibits in the record show that at times, just as the policy allowed, that she may have telework five days a week for temporarily for specific projects. So what's your response to the question I asked your adversary? Sort of how do you square, I guess, at least the implicit determination of the SEC here that some physical presence is an essential attribute of the job with the pilot program and the now going forward policy that says five day a week teleworking is fine? Well, Your Honor, the CBA acknowledged even in the pilot program that employees could and would be expected to report to the office when necessary, when called in for specific purposes or for all hands, meetings, training and such. And it's undisputed that the use of the Bloomberg terminal, which is the SEC, has limited license, licensed terminals dedicated to that service throughout the course of all relevant time. In this case, that service was not available except in the office. So there was always some need for an employee to report to the office, regardless of how many days a week they teleworked and whether they were under the pilot program or not under the pilot program. And in the replacement CBA that was actually signed in November of 2013, there was still acknowledged that the SEC could call the employees in as needed into the office, notwithstanding the that they were on full time telework. And further, the Ms. Holloway's job description required certain activities, conferences and coordination with other team members at critical points throughout investigations as they were planning the investigation, as when they were reviewing results, when they were making presentations to superiors of their findings. Those items occurred in group meetings on the premises. So you're saying that even if she had qualified procedurally for the pilot program, it wouldn't have been enough? Under what she, under what Ms. Holloway demanded, it would not have been enough. And the SEC was considering her her demanded accommodations or what it perceived to be her, you know, the minimum she would accept. And in fact, in early 2014, in February, when there was discussion of the changed CBA and bringing Ms. Holloway back, her then attorney made clear in a communication to the disability officer that all of Ms. Holloway's past demands an important component was five day a week telework. So even as late as the time they were trying to bring her back on board, it was still the demand through her attorney that she had to have five day a week telework, which was what they essentially gave her at that time. So how do you interpret, I guess, both the documents that Judge Royal read earlier where, you know, she says, I'm flexible, but I have to have confidence that I won't be, that I won't encounter this individual again. And your adversary's suggestion that this was just sort of a kitchen sink request and that it was just sort of a bargaining position and she would be willing to back off of it. Well, Your Honor, first, I believe her attorney's position a few months later makes clear that her intent was to get five day a week telework. That was an important component of her demand in 2013. And but if you look at the history, Ms. Soloway, the alternating telework schedules for from October to December 12th worked. She later admitted and confided earlier to her psychiatrist and therapist that it worked. And as far as from that time forward, although there was no formal telework agreement, she conceded in her response to the notice of proposed removal that she still that even that worked. Yet even though that was a working proposition, she didn't require an additional accommodation. In other words, she came forward in April of 2013 and said, I want more. And she came forth with the demand that, well, it could be either alternating schedules or telework five days a week for me. But in essence, though, her other demands in that particular document show that she had to be guaranteed she would never be exposed to a ARO employee, which is what we've referred to her former supervisor in the brief or in all of the proceedings in this case. And the way that she worded her demands for protection from him did encompass more than the workplace. And even back in 2011, she was saying that she wanted to know the SEC to advise her at all times of his whereabouts. Well, the SEC could not control what any of their employees do outside of the workplace. They may later discipline them if they violate some law, but they can't control and especially advise someone else of what the person is doing. For one thing, we'd have Privacy Act concerns. And what she was wanting was a de facto restraining order. But instead of going to the state courts to seek a restraining order, which under these facts is doubtful, would go anywhere. She asked the SEC to impose one administratively. It was not willing and felt it could not do that. That was an undue hardship to them. And these issues sort of bleed over on the failure to accommodate claim as far as she was not qualified employee for purposes of her demand because she demanded things that would not allow her to perform some essential functions of her job. And the SEC, in fact, accommodated her, as the magistrate judge found and the district judge adopted by the temporary accommodation and by the events going forward, the continued scheduling that allowed her to avoid seeing a our employee in any way, shape or fashion. According to the union response to the notice of proposed removal through that date in October of 2013, she had not. It had been working. So even after she made this new demand, she was admitting that what I was already doing was sufficient, but I want more. And the. Truly, some of the things she was demanding, the SEC had shown below that it posed an undue hardship to them to fully accommodate her with what she was requiring. Now, turning to the retaliation case, the reporting recommendation found three grounds that each independently would allow summary judgment on behalf of the defendant, on behalf of the SEC. First was that Ms. For purposes of retaliation. And second, that she did not establish a causal connection. And third, that even if she did establish a prima facie case, that the SEC had proffered and demonstrated multiple at legitimate, non-discriminatory reasons for well, non-retaliatory reasons for its action of issuing the NPR and placing her on paid administrative leave while it was investigating and allowing her at the due process time of challenging the notice and trying to convince the decision maker not to implement the notice. On the retaliation claim, are you making the argument that it's been waived by the way it was handled in the court? Yes, that's what I was next moving to, Your Honor. That two of the issues that are independent grounds for summary judgment for the agency are that she failed to show a causal connection because there was no close temporal proximity and failed to show that the legitimate reasons were pretextual. And in both the R&R and in the opening brief, in this case, the plaintiff did not challenge those issues. And precedent in this court that at either stage, by failing to object below and by failing to brief it at the opening brief before this court, that those issues are waived. And if those issues are waived, then the issue of whether she the proposed removal was a material adverse action does not have to be reached in that portion. Summary judgment motion should be adopted. And the SEC believes strongly that the waiver should apply here, notwithstanding plaintiff's attempt to address those issues in the out of time reply brief that was filed. And even as far as the if that issue about materiality or that she'd shown a material adverse action is reached, this court has never decided that issue. It noted the issue in one case in the past in the in a First Amendment retaliation case involving a law enforcement officer who was placed on pending fitness for duty review, which is similar to a notice of proposed removal if they fail their fitness review. They would, of course, be terminated. And this court noted the issue and cited a Ninth Circuit case that found similar circumstances would be enough to state an adverse action. And then I believe Seventh Circuit case that found otherwise and supports is similar to the case cited in the report and recommendation below for that prospect that it does not. But the court in that case decided that they would assume for the purposes of the decision only that it would state an adverse employment action. And that was in Duraldez v. City of Dural, 19, I mean, a 2016 unpublished case, 62, the Fed Appendix 803, which I don't believe was actually cited in our brief because for that proposition, we cited the Carrero case that the magistrate judge relied on, which was collecting additional cases from other circuits. And if the court reached that issue, the SEC would proffer that the court should follow the majority of circuits that have found that those types of circumstances, a paid leave that did not affect the pay benefits or any other aspects of the employment where the employee is later reinstated, does not show a materially adverse action for purposes of retaliation. There are no further questions. The SEC would ask that this court affirm the district court below and allow the summary judgment decision to stand. Thank you very much. Mr. Kaufman, three minutes, five minutes. OK, the first thing I want to mention is something that Mr. Kaufman said, the SEC agreed that the temporary accommodation was reasonable. He said they thought that was reasonable and that's why they put it in place. What's important about that is that that's exactly what Ms. Soloway had asked. She had asked for alternating telework, telework for herself, telework for the employee at the ARO. And then we deal with the issue of Wednesdays through either ad hoc or by her taking her PTO time. That worked. OK, the record is unanimous in the fact that that was a successful accommodation, not only through Ms. Soloway's testimony, but also through the testimony of her psychiatrist and her psychologist. Also, we have her supervisor, Mr. Foy, testified that during that period of temporary accommodation, there was no violation of the CBA. It was not an undue hardship. He thought that it was perfectly legitimate for someone to telework and then come into the office occasionally to do the stuff that has to be done in the office. What's important about that is when you're only working telework five days a week for a two week period, that means you're in the office four or five days a week. I mean, four or five days every two week period. More than enough time for her to attend her meetings or trainings or the other things that they actually do in the office of the SEC. It's also important to note that her second level supervisor, Ms. Dignam, testified that in an email, I should say an internal email. This is not her testimony. In an internal email, she said that it would be a hardship not to allow Ms. Soloway to telework under these circumstances, referring to the temporary accommodation that was granted to her. Can I ask you a very basic question? I'm very sorry that I've missed this, but Ms. Soloway is back at the SEC, right? She is. Yes, she is. And what what relief are we talking about here? What what what's the harm? What are the what's the remedy? Well, I don't want to get ahead of myself, but she you know, her claims in this case, she didn't lose any money, so it's not a monetary claim. She did exercise her PTO days that she had to use during periods that she was not accommodated. So she'd be requesting that as a relief, the refund of the of the PTO days, compensatory damages and attorney's fees. Compensatory damages for what? Just so I'm clear. For the retaliation claim. Got it. And what do you say to I'm sorry. Go ahead, Judge Hull. No, I just I thought it was for not accommodating her to compensatory damages for not accommodating her during. Correct. Yeah, the discrimination claim. That's about a three year period that she says she inadequately accommodated. She wants damages for that, too. That's correct. And I want to turn to the retaliation case because I think this is really important because putting aside all the disputes surrounding the discrimination that failed to accommodate issue. There's no question in this case that the termination, the notice of termination was causally connected to the request for accommodation. It says it in the letter. She was found to be medically unable to perform her job because of her PTSD. Before you get to the merits of your causation argument, you should probably answer Judge Royal's question about waiver. Well, what the SEC is saying is that we waived an argument about the causal, the temporal connection between her, I guess, request for an accommodation and her termination. That's not the argument we're making here. I've never relied on a temporal connection between these events because the letter notifying her of her termination was explicit that the reason for her termination was the fact that they could not accommodate her PTSD. So there's no, there's really no dispute that that was the reason why she was being put on a termination notice. It wasn't that we had to rely on some kind of circumstantial evidence because of the temporal relationship between the two events. And that's what we've argued consistently in this case, both in our brief and below. What's the adverse employment action here in terms of the fact that you said she was told she was going to be terminated, but she actually wasn't terminated and she was returned to her job. She basically got what she wanted on return to the job. And so she had paid leave basically for, what was it, four months. What is the adverse consequence here of that employment action? Well, we're operating under the Supreme Court's decision in Burlington Northern versus Santa Fe, which is the applicable standard for retaliation cases. We don't have to show an adverse action in terms of her pay or her position or her job duties. What that decision says is that it's a materially adverse decision if it's something that would chill an employee's, you know, desire to complain about discrimination. It would dissuade them from coming forward, in other words. And the court's reliance on that Cario case is wrong. I mean, that's a case where the employee was placed on administrative leave pending an investigation, a neutral decision. There's nothing, you know, negative about that. This case is very different. This is a case where she was placed not on suspension because of an investigation, but because we're notifying you that you're going to be fired. And as you may be familiar in the federal system, there's this long process of of how one is terminated. But it was not, we're just going to investigate the situation. It's at the end of the day, you'll be fired. So it's much different and it's closer to the Northern case. And as well as this court's case in Crawford v Carroll, where this court adopted the Burlington rationale. Great. Thank you so much. All right. The third and final case for the day.